Please call the next case. Good morning, Your Honors. Chris Jepson, Strucker Jepson & Associates, representing TitleZone. How do you spell that name? J-E-P-S-O-N. Mr. Jepson. And for the appellee? Good morning, Your Honors. My name is Mary Labreck. I'm an Assistant Attorney General here representing the Illinois Department of Financial and Professional Regulations. Could you spell your last name for me? L-A-B-R-E-C. Very good. Both of you will have 15 minutes time. Appellant, reserve from your 15 minutes however much time you'd like for rebuttal. Appellant, please proceed. Thank you, Your Honor. As I said, my name is Chris Jepson from Strucker Jepson & Associates. I represent TitleZone and All American. Your Honor, this appeal is an appeal from the decision of the hearing officer, which was incorporated in the state's final revocation orders, as to TitleZone and All American. The hearing officer determined that All American was incompetent and untrustworthy in guaranteeing titles to endanger the public in that they did not give the right to revocation. However, the weight of the evidence, in fact, all of the evidence in the case indicates that, in fact, All American did give final HUDs to all of the parties. Mr. Jepson, you're not just a lawyer today, right? You testify in this manner. You are a principal of All American Title. That is correct, Your Honor. As such, and then you helped set up TitleZone, did you not? We did, Your Honor. And what background did Elnora White possess that led you, you, Mr. Jepson, to believe that she'd make me really good at owning 30 percent of a title company? Well, these companies, Your Honor, were not... No, no, answer my question. What abilities did Elnora White possess? The person you set up in a title company with 30 percent ownership. What did she possess that led you, as a person involved in title companies, that she'd be good at that? She was simply an investor, Your Honor. Okay, and did you ever personally meet with her? Yes. Okay, and so when she was let in and TitleZone was set up, using the phrase, estate of Elnora White, is that the phrase that was used? Well, TitleZone was set up when she was alive. Okay. Then she passed away in an application that was submitted to the state. It was actually a second application submitted to the state, and at that time she was deceased. Okay. So it was her estate because she was the owner of 30 percent of TitleZone. And she was an investor? She was an investor. How much money did she bring into this? I think like $300. Okay, and so for $300, you were looking for people to set up a title company with, and if they could come in with $300, you'd cut them in for 30 percent because the title company you're founding is worth $1,000. Is that right? Not exactly, Your Honor, if I could explain. No, please. Okay. At the time that these title agencies were set up, there were actually seven of these agencies that were owned by All-American or its principals at the time. Title agencies were being set up with mortgage companies, and the mortgage companies were able then to derive a percentage of the profits based on their ownership in the title agency. So all of these title agencies, with the exception of All-American and Palatine Title, were partially owned by other mortgage companies. And that program was a program that was done by the underwriters and the title companies throughout the country at that time. So everybody was doing this. Every title company was looking for people to get involved in this, whoever they were. Would that be what you're telling us? Well, if they had mortgage companies or were a provider. Well, again, Eleanor Wright didn't have a mortgage company, did she? She had $300. That's correct. But her grandson had the mortgage company. Charles? Charles, correct. And did he go to prison? He did. How far along? I'm not sure what the time was. But that had no relation to this case. He went to prison, Your Honor, having to do with mortgages that he made and lies that he told to the banks, which had no relationship to his position. These were foreclosure rescues. Correct. One of the questions on the HUDs is who got the money, and that some went to Eyes Have Not Seen, which is a subsidiary that Mr. White owned. In some of these, it shows directly that monies went directly at the closing to Eyes Have Not Seen. But under the mechanism of these rescues, what would happen is they would sell the property, stay in it, and then pay it off in a year and get back into title? They were selling leaseback transactions. Right. How many of them got their homes back? How many people do you know? And again, you're not the attorney. You're an attorney now. You were an attorney when you set this up. But you're a principal of a title company, All American. How many homes did All American Title return under this setup? Your Honor, All American Title was a title agency. It had nothing to do. Is my question not in English? It calls for a number. Do you know the number? No, I wouldn't, because I had nothing to do with the mortgage rescue transactions. All American Title had nothing to do with the mortgage transactions. Correct. In fact, all it did was close the titles, just like Stuart Title and other title companies did. Yes, you recite several times that Stuart Title did the same horrific things, I'd suggest, speaking just for myself. And therefore, you should be found it's okay, since apparently Stuart Title is out there still. You suggest at page 8 of your reply brief, sir, that it's not the title you just suggested now, that it's not the closer's business, or in this case the title company's business, why the seller would agree to give his equity to Charles White, who is an employee of TitleZone. Rather, that is up to what business would you have of doing that. So you're suggesting that a title company would have no interest in knowing why a seller would give all of their equity to the title company's employee, right? They weren't giving it to the title company's employee. They were giving it to EH&S. Correct. And who owns EH&S? As far as I knew, White owned EH&S. And was he an employee of TitleZone? Not in those transactions. He was an employee to get other mortgage companies to do business with TitleZone. He brought clients to you? Correct. Okay. And now the distinction in the statute, this was a title guarantee under that clause that they fit? Yeah, the statute that was used was incompetent or untrustworthy in guaranteeing titles to affect the public. Okay. But what Mr. White was doing was not guaranteeing titles? No, he wasn't. He was doing closing. That's what All-American was doing. They were closers. Correct. So they didn't have anything to do with the substance of – well, the only substance of what they did was to make certain that the property closed properly and that the monies were distributed in accordance with the direction of the parties. Of the parties, right. So there's a distinction between – statutory distinction between the functions that were here. We're talking about two entities here. We're talking about TitleZone and All-American. They had nothing to do with Mr. White other than he brought them deals and they did the closings, but they didn't guarantee the title. They guaranteed – All-American and TitleZone guaranteed the title as title companies. You know, they issued a title commitment and a title policy that was accurate and correct. And they also did the escrow closings. And at the escrow closings, the closer would come to the closing. They would not know the buyer. They would not know the seller. They would be operating out of instructions from the lender and instructions from the buyer and the seller. And they would do what those instructions said. If the seller had some claim that Mr. White had defrauded him in taking the money, it had nothing to do with the title company. And no one showed up here to say – Which title company did it have nothing to do with? TitleZone or All-American? Either one. So he solicits, as you just said, Charles White's job was to solicit hundreds of clients for TitleZone. How many did he bring in? He brought in like 14 mortgage companies separate from his own to do closings. And it was his job to solicit those mortgage companies. So when Starr made the complaint about this and you looked into it, there was a question about the number of HUDs that were used in a transaction, sometimes three, sometimes five. It differed. So it was a moving target all the time. These title agencies, Your Honor, did thousands of closings. Four of them were complained about by Southstar. And the complaint made by Southstar was that the preliminary HUD, the HUD that was approved originally before the closing that had Southstar's numbers on it and only Southstar's numbers on it, was different than the final HUD that was done after all of the sellers and buyers' closing numbers were on them. And that's always the case. According to the briefs, that's not an uncommon practice. No, it is the practice. How common is it, though, for at the closing, for the money to be given by all of the equity by the seller is turned over to an employee of the title agency? How common is that of a practice even back in 2006, sir? These mortgage rescue transactions that were selling leaseback transactions were being commonly done throughout the city in 2006. And the money went to the – And did it go to the title company? Is that who received it? No, no money went to the title company. The money went to Eyes of Not Seen, which was a company that White either owned or had some interest in. Right. And he was indeed an employee of both All American and – No. No? He was only – Oh, he was in marketing? Right. He was only an employee of TitleZone. Right. Okay. And that was just in marketing for TitleZone. Correct. It was his grandmother with the $300 that was an owner of TitleZone. Yes. That's 30 percent. But, Your Honor, it didn't make any difference to the title company whether it was his grandmother or it was him. We were forming joint ventures with mortgage companies where the mortgage company would have a passive minority interest and not have anything to do with the title operation. And the only business in the title that the mortgage company would do would be to refer business and to try to find other mortgage companies that would do business with the title company. So when you were running All American and setting up TitleZone, you had no interest of any kind. What would occur to the sellers who would be ensnared or decide to hire Mr. White to do their – for this mortgage rescue where they would give up all of their equity in exchange for possibly staying in their homes for one year? You have no interest in that. Well, Your Honor, we weren't part of his transactions, number one. And number two, they didn't seem uncommon to other mortgage rescues, so-called mortgage rescues. So it's common for everybody to do these horrific things, and therefore you'd get in on it before people stopped doing it. I know you call it a horrific thing. It is a horrific thing. But they're the same things that Fannie Mae did and HUD did. These were selling leaseback programs that were copied or not copied White's, but they were done by other entities as well, not just White's. And to the extent that they would enable a homebuyer to have a smaller mortgage payment than he had before and save his home, then it was a sensible program. And save his home. And you were unable to answer, if anybody, this helped the seller? I only know what White told me. I have no personal knowledge because I wasn't involved in any of this. But again, you're a principal, and that's one of the problems, sir, when we have lawyers, anybody step up. When you step up as a principal as opposed to hiring someone, you're a witness. Now, you're not a witness today, but you're acting in a pro se capacity today. That's what you're here as. You're here as a pro se capacity. And so when you say, well, I don't know, well, a lawyer can readily say all the time, I have no idea what my client was doing. But you're the client. It's not that I don't know what I did, Judge. I'll tell you everything I did. I don't know what White did because White was acting not in the capacity of the title agency. Let's take the episode that you don't know what Charles White did. Correct. You don't know what he did. It doesn't, then, indicate that titlism should never have been set up. That the whole thing is just quicksand. That the person who set it up, you and your partners, set it up. And yet you don't know at all what he did. And yet we should still return to you the ability to set up more title companies. Why should we do that? Well, first of all, Judge, I don't have any idea at the time that we set that up what he was going to do. And secondly, from doing just the title business, it would be impossible to determine what the deal was between White and the client, his client, what the deal was between White and the mortgage company or the lender. The title company has no way of knowing any of those things. If you set up a title company, which you said you did, titlism, and he's an employee of that company being paid $5,000 a month, and when he's doing that, he's then receiving, at the closings involving that title company, all of the equity of the people he solicited, you say that there's nothing that could be done to determine if that was true? Isn't it on the HUD-1 form indicating this? Wasn't that the problem raised by the regulators? The final HUD form for the first time indicates that all of the equity in these transactions was going to EH&S. Is that right? Not all of the transactions were mortgage rescue transactions, but in the mortgage rescue transactions, a substantial part or all of the money on the HUD was going to eyes of not seeing. And wouldn't you know that? Before the title company goes ahead with this mortgage rescue, wouldn't they know? They wouldn't agree to back this unless they knew that somebody, that frankly the seller, was going to turn over the equity. Right? You wouldn't have to trust these poor people to pay off this stuff when they'd already failed to pay off the bank. They are non-creditworthy. The deal is when Charles White signs these people up, EH&S is to get their equity. Right? I don't know what the deal is when he signs them up. The only thing I know is that there was equity given at the time of the closing. Wouldn't that have been agreed to before any laws were made, before a mortgage company would give money to a poor person who's being foreclosed upon? Wouldn't they need to know at that point that they will have equity given to them, something from the seller? Right? Well, Judge, there's three parties. Now we have the mortgage company brought in to what happened between the seller and Charles White. What happened between the sellers and Charles White was some agreement that they made that caused the seller to indicate to the closer to pay the money that the seller would otherwise have gotten, or some of it, to eyes of not seeing. Right. It's not the closer's position to ask the seller why he wants to do that. It's between him and Charles White. It had nothing to do with the closer. When? When is it their job to know that? Since that is how this has to work is the person, the seller, Charles White has to know that he's going to get the equity or he won't have the deal signed. It makes no sense. He's not there as some nice person to give away money, and neither is the mortgage company. They would have to know that it's a lease-back operation from day one, and yet that was never reflected on the HUD ones from day one. It is not reflected until the final HUD ones. Or am I mistaken? The only HUD one that it would be reflected on would be the final HUD one. Even though, right? Yes. Okay. And so it was reflected on every final HUD one. But not the earlier ones where they're actually asking. None of the seller's numbers or the buyer's numbers were on preliminary HUDs. For the most part, that was just the lender's numbers on the preliminary HUD. Okay. If, as you say, that there is the distinction between just being the closer and being a licensed title company, if that's so, were there any claims ever made or paid out by All-American and or TitleZone? Did you vet these yourselves? Didn't you go through due diligence to determine the creditworthiness? Did you make payments out on these? Judge, the title company doesn't determine the creditworthiness, doesn't make the mortgages, has nothing to do with the loans. Do you insure over any imperfections in what happens? Do you examine the title? We might insure over a mechanics lien. We do examine the title and we guarantee the title. And there were claims in all of the title companies that normally arise from the title companies. But in the terms of claims by any of these sellers, there was only one seller that showed up at the closing and made a claim and they wasn't determined to be credible by the hearing officer. So none of the sellers said that they were defrauded. The problem, I believe, was that White was defrauding the mortgage company. Now, he was your employee, and so therefore under the statute. But not in the mortgages. He was, you know, Judge, it would be similar to if you had a law clerk that robbed a 7-Eleven. It would have nothing to do with your being a judge or a lawyer. What if he filed false documents every day, 880 times, and you still employed him? Do you think that might reflect on your ability to be a lawyer, Mr. Jepson? Pardon me, Judge? On your analogy, your analogous situation, your firm hires a law clerk, and you suggested, well, this is no different than a law clerk sticking up a bank or a 7-Eleven. Well, how about if it's not disconnected? Mr. White is ripping off people that he's involved with in getting mortgages. All right? That's the nature of this complaint. If you were to hire a law clerk who filed in 880 cases false documents or stole documents, do you think that would reflect on your ability, your ability, Mr. Jepson, as a lawyer because you employed that law clerk? Judge, I employed him as a law clerk, not as a robber of 7-Elevens. Well, then we understand that there's nothing that you're really responsible for. Not a problem. But what was articulated and looked at by the Board was that there was a failure of oversight and that you were hanging around with the wrong people, doing business with the wrong people. Is that correct? Obviously, Judge, if we had it to do over, we wouldn't have made a deal with Charles White. But we were making deals simply with mortgage companies where we were doing title work. Well, that's your explanation, but what happened here is what you were accused of by the Board. In the end, after a hearing, there were only two things that we were accused of by the Board. None of the other horrendous, outrageous things that we were accused of were proven at the hearing. There were at least five other title companies that were involved, and they got back in again. They were suspended, and they got back in again. Because they had no closings or any relationship or done anything with White. And you still own those five, too, don't you? We still own them, Judge. They're not operating, but we own them. Okay. And the secretary is the one. Was it the secretary of the Board that made the final determination and did all these administrative things that there was somebody who, if I'm remembering this correctly, there was someone who did add somebody back in here? Well, what happened, Judge, is that the hearing officer, after hearing all the evidence, determined that the state should not have revoked the licenses of those five entities. Then the circuit court determined that the state did not have the authority under the statute to revoke the license of those five entities. Then the hearing officer suggested that all Americans' revocation be terminated and said the only thing they did wrong was not present final HUDs on a timely basis to all the parties. But every file showed that there were final HUDs presented, signed, by every party saying that they received the final HUD and certifying that. And every lender issued its funding authority indicating it received the final HUD. That's a closer's responsibility, right? Yes. Okay. But the way you interpret the statute, you're locked into that, even as the title guarantor. I don't understand the question, Your Honor. There's two separate sections here. You've got the conveyance, which is where you have the problem, where you're actually doing the HUDs and you're closing. The escrow closes. But the title company, you're still linked to it as the title company, the guarantor. Well, nobody ever indicated there was any issue in regard to the guarantor of the titles in that the policies or the commitments were in error. The searches were done. The commitments were correct. The policies were correct. Is there a distinction, then, between the statute's application in that regard to all American and the title zone? The statute is a very wide catch-all statute. No, it's not. Well, it says incompetent in guaranteeing titles. Yes. We weren't accused of doing anything with guaranteeing titles. But we're talking about the involvement. There was the involvement with these closings. With the closings. Correct. So how is it, then, since these entities are all affiliated and you're controlling them all, that they're not a party that's responsible for that? Well, what the hearing officer determined is the only thing that all American did that it was responsible for doing that did wrong was not provide final HUDs to all the parties on a timely basis. But, again, every file indicated that every party signed off on the final HUD which certifies that he received a copy, and every lender gave funding authority. And Stein, the investigator, admitted that every lender authorized the funding after seeing the final HUD. So the manifest weight of the evidence, all the evidence, indicates that that was incorrect. You'll have five minutes, sir, if you'd like to conclude. I'll hold my five minutes for rebuttal, if I may, Your Honor. Very well. Thank you, sir. Ms. Labreck, proceed. Good morning, Your Honors, Counsel. The essence of the Department's case is this. Their goal was to identify signs of untrustworthiness or incompetency in transacting the business of guaranteeing titles to real estate in such a manner as to endanger the public. Can you raise your voice a little, please? I'm sorry. Their goal was to identify signs of untrustworthiness and incompetency in transacting the business of guaranteeing titles to real estate in such a manner as to endanger the public. That's Section 21A3 of the Act, and the Department took steps to protect the public to the extent possible before harm materialized. When it received the complaints from South Star, it investigated, and it found sufficient evidence to establish that the agencies were helping to conceal important information from the parties, information that went to the very nature of the transaction. The Department did not need to go further with its proof because that demonstrated a danger to the public. Where's the connection, though, that gets denied by your opposing counsel? He suggests that all they had to do was shuffle the papers. Your Honors, we contend that that's not true. They did not have to scrutinize the origin of the employment reports and so on the way that the lender did, but they did have a duty to coordinate the closing intelligently, and they played an important role in maintaining the integrity of the system. That's why they have to be licensed, and that's why they're required to be trustworthy and competent in what they do. Are they licensed both as a title company and also as an agency that does closings? The title company did do the closings. And here's another thing that it's important to understand. He says Charles White did these things in a completely separate business. Here's what was happening. It was evident from the materials submitted by South Star that what was actually happening is that these closings were occurring in Charles White's office at Eyes Have Not Seen, and he had an interest in both the mortgage broker, Mutual Trust, the company that was receiving the money, Eyes Have Not Seen, and the closing company, which was both TitleZone and All-American. Splitting up the responsibilities is a little artificial. They were both clearly involved because TitleZone carried the ownership interest and also the employees who conducted these transactions, and they were done in the name of All-American. And so here's how the department assigned the responsibilities in accordance with the agency's characterizations. What All-American did was it failed to make adequate disclosures of White's financial interests in the company that was transacting the title business, and it concealed the nature of the transactions by completing the HUD forms, and also we can add the occupancy statements improperly. And how did that impact under Section 21A3, which allows the secretary to revoke the holders of registrations who have demonstrated untrusted worthiness or incompetency in transacting the business of guaranteeing titles to real estate in such a manner as to endanger the public? Which is their argument, it seems to me, is that, look, we may have done all sorts of horrific things, but none of them involved titles. Nobody said we wouldn't insure over on a mechanics lien. My goodness, our title policies were wonderful. And so under 83, how can our ticket be punched? Because we didn't do anything bad with the titles. Well, it's because they were responsible for conducting the closings, and there was something wrong with the HUD forms that they used in conducting those closings. Well, wouldn't that bring it under 21A1, which provides that the secretary may discipline people who intentionally make a misrepresentation in relation to any manner covered by the statute with the closings as opposed to title policies? Well, I don't know why they chose 21A3 rather than 21A1, but one of the reasons may have been that they were concerned about what he was doing regardless of whether it was intentional, that they were creating a significant risk to the public by what they were doing. And here's what was happening. They were preparing two very different HUD forms in most of these cases, one indicating that cash from the sale of the home representing the equity went to the seller, the other indicating accurately that it went to Eyes Have Not Seen, and the version indicating that the cash went to the seller was presented to the lender for preliminary approval of the loan. It is true that some, the record suggests it is true that sometimes there are preliminary HUDs that are done without the seller's information, but the ones that Southstar was complaining about did have this information, and they included the wrong information. And the accurate version was faxed at closing while the parties were waiting on the phone to close the agreement, or not disclosed at all. One of Title Zone's employees admitted at the hearing that sometimes they were not included in the final HUD, the disclosures to EH&S, but happened afterward. And now mishandling these disclosures is not necessarily fraudulent, but in the context of these transactions, it is plain that the delayed disclosures were intended to deceive. A transaction where all the equity is going to a third party naturally draws more scrutiny than if it was going to the seller, and the closers repeatedly submitted statements indicating that the cash was going to the seller, even though, as Your Honor suggested, they must have known that it was going to Eyes Have Not Seen because placing money for escrow for rent was intrinsic to the transaction. But if you're doing it on a sale and leaseback basis, then the money that they were holding was likely a prepayment of the cost of basically rental of the boat during the year that they had to try to right their ship, get themselves to buy this back. So what they did was they would take that money and they would put it in and apply it against basically a monthly rent. Was that what they were doing? That was the theory under which they were doing it. But if they had disclosed this in the preliminary HUD, then this would have caused the lender to give it closer scrutiny. And if the lender had given it closer scrutiny, it may have discovered all the falsifications in the mortgage application. And because, in fact, it said, don't worry, here's a perfectly blameless transaction, and it turned out to be something that they should have investigated more clearly. I take it by the first, when you said that 21A1, were you suggesting that 21A1, a violation of that, requires intentional misconduct, whereas a 21A3 violation may be based on unintentional, just very, very gross negligent conduct? I don't want to say too much about that because, as I said, Your Honor, I'm not sure why they made the decision to do that, but there is that one statement in 21A1 that says that it's intentional. But I really can't tell you why they made that decision. But what they did was certainly covered by 21A3 because it certainly demonstrated untrustworthiness or incompetence, whichever they would prefer. And it may be that White strategically held off giving explicit directions until the closing, but that doesn't excuse them submitting a HUD that they had to know was incorrect. How did they have to know that? Because they had done numerous transactions, they knew they were sale and lease back, and they know that the essence of it is that there's going to be a transfer of money to, as Your Honor suggested, to a holding company because it's going to be escrowed rent. And they know this, and so that should be coming up front. That should be a part of the preliminary HUD that's given to the lender. How would All-American or Title Zone know that? I mean, they weren't the actor here. It was White. Well, they were there at the closings with White and with the buyer and seller, and they also had done a number of these transactions before. They admit that they knew he specialized in sale and lease back transactions. We've already discussed one explanation for that, which is that the money was going to be deposited with eyes of not seeing, so that they would have the money to pay off the amortized rent. Well, that's an explanation for the arrangement to give the money to eyes of not seeing. It's not an explanation for why they didn't disclose that in the preliminary HUD. The problem is that they... Didn't the lenders follow up to take a look at the final HUDs? They did to some degree, but... They were, but he was obliged to be ethical in his conduct, too. A retail store can't short people on change at every transaction and then say if they were careful, they would have noticed, and if they had noticed that we were shorting them change, we would have gladly given them the extra 15 cents. The question is the access to the information so that they could make that determination. For example, sometimes you have a HUD change because you're going to have a question over who pays the transfer stamps. I'm sorry, Your Honor? These are looked at carefully by lenders and others, and they're not always the same, and the reason sometimes there are things like these changes in HUDs is that sometimes there's a dispute over who's supposed to pay for the transfer stamps on the property as the title is changed. Sure, there are various reasons why you might have to change HUDs, but that's not what happened in these cases. That's not what he... He does say hypothetically there are lots of reasons to change it, but he's not contending that the reason why they... The difference here was the difference in whether or not they reported the money to ICE have not seen. That decision not to disclose that until the end of it all has nothing to do with any of these other reasons why one might have changes in the HUDs. Well, it's not an end. It's just the final product, and that's looked at by whomever wants to see it. And the lender is looking at that. They've already approved a preliminary HUD, and then the closer calls them up and says, I'm about to send you the final HUD. I've got the buyer and seller here waiting, and we'll wait on the phone while you approve it. And in that context, they're inviting what happened. And it is our position that that is part of the untrustworthy conduct that existed in this case because by doing these things, by doing these deceptive things, they facilitated the fraud that, in fact, did happen. You're presuming that this happened in each and every case, and I don't know how that could be done because these are looked at afterwards, and there are other people whose eyes are responsible for looking at these things. And the lenders want to know, so they track this. So it's not you. How could this apply to every single transaction that Title Zone and All-American did? Well, we're not saying that it necessarily applies to every single transaction. I'm sure that even Charles White, if offered a legitimate transaction, wouldn't refuse to do it. We're just saying that in a large number, that's what happened. Star took the initiative, and they brought it up. Afterwards, after the closing, they discovered it. But yes, Your Honor, certainly the lenders, if they had paid more attention, they could have found it earlier, but that doesn't excuse what they did. What Title Zone and All-American did. The lender could have found that, or if they had been scrutinizing more carefully, they could have found it. But it's our position that even though the lender could have done that, there's still no excuse for what these title agencies did. You're making this as applies to every single transaction that they had, and it could be an anomaly. White obviously had some other troubles, not directly related to what's going on here, but the parties that were involved, the different parties, had the ability to make determinations as to whether or not this had been done correctly and fairly. But the department found a pattern of this kind of thing happening. You're presuming that this happened on an ongoing basis as a regular practice of these two companies, Title Zone and All-American. Not in every case, but we did find a pattern of this happening in a number of cases, and that was significant to raise a concern for us. Because we need to, if he's only cheating people 30% of the time, that's still something we don't want to have happen. Well, but the checks and balances that are in here could have brought those up, and All-American and Title Zone could have addressed those. I'm not sure I did, I'm not sure what you. I'm just back to the point again of it's not over until it's over, and if you find that there's something wrong, you go back and you cure it. Okay. You're saying you have some unknown quantity here that puts the burden on All-American and Title Zone as though this was a conscious practice of theirs to do something that was incorrect under the statute. And I don't see anything in the record that says that they knew that that was happening. Well, they even admitted at one point, there was a letter written by Patricia Jepson to Tycor, and that is at page 1766 and 67 of the record, and she acknowledges there that they should have shown the payments on the HUD prior to closing, and she promises a greater effort to do that in the future. And, Your Honors, it just doesn't make sense. She's a principal with Mr. Jepson. She's a principal in Title Zone and All-American. So she went out and found the cure. Well, she promises to do better next time, but we... They're looking for a universal application here, and we've just discussed something where they came in and did the right thing when it was found. Is it one trip over the wire? Is it ten trips over the wire? You're talking about putting these companies out of business, and that they don't care about what they're doing, and there are other people involved in what they're doing, and therefore it's a system that should have checks and balances within itself, and sometimes they are discussed and they're found. Starr did it, and you just mentioned Tycor. Well, we don't know if they actually did that, but that's what she said at that point. That's after South Star had already complained, and we'd already set in motion what was happening here. But here's an investor, Jepson's an investor in Title Zone and All-American, and she found a mistake, and Tycor's still in business, and they're still doing business with them. Is that correct? All-American, none of the seven agencies are still in business. Your Honor, Mr. Jepson just testified that they're not operating. I was talking about Tycor. Tycor? Tycor. Tycor, as far as I know, is still operating, but the record does not indicate how many transactions like this they were involved with. And the situation, well, the reason why the department was concerned here is because we had this constellation of factors. We had them, not only were they concealing the nature of the transactions on the HUD, but they were also concealing White's financial interest in the transactions, and these companies were all mingled together and operating out of the same offices, as I've just said. They were also, another thing that wasn't stressed, but which they must have known is in a number of places, there are declarations of where the buyer is going to live, and again, that goes to the very nature of the transaction. They know the purpose of these transactions is to let the seller stay there, and so it should have rung a bell at some point when they see declaration statement after declaration that says that the buyer is going to live there, or says nothing at all. Some of them were incomplete. And then they also knew that Charles White was engaged in a highly risky kind of transaction. They knew he was completing multiple transactions of this kind, and they knew that he had significant financial interest and control over all three of these agencies that were creating the transactions, the mortgage broker, the rescuer, and the closing agency. So other than Mr. White, is there anybody else that has been a problem in the same regard that the department has determined? Well, there were other people who were convicted along with Charles White in the federal prosecutions, stemming out of some of these things. That's a different church, though. Are you saying that they contemporaneously did this through other entities? No, there are other people who participated in the same scheme. There was another employee of TitleZone, a woman named Felicia Ford, who was also convicted for participating in this scheme. There also was an attorney named Norton Helton. What he would do is when they were about to do the closing, Charles White would meet with these people, meet with the buyer and seller, and they'd bring in Norton Helton as this attorney, and they would say, you can consult with him, and he'd tell them it was a good deal. And he also, in a number of cases, offered fraudulent bankruptcy proceedings, and he would help them go through bankruptcy, but he wouldn't tell them, he wouldn't tell the bankruptcy courts about the sale of the property that he just participated in. And so this whole scheme, the function of the department was not to trace all the details of this fraud. For them, it was enough when they found a pattern of deceptive things that were going on, and they also found that despite everything that TitleZone knew, it had an employee relationship and an ownership. It was continuing that relationship with Charles White, and on that basis they revoked the agencies. Mr. White was always described as the executor of the estate, never said what his interest was in and of his own right, and only talked about his mother's. His grandmother's. Yeah, well, there were a number of factors, though, that highly suggested that he had more than, that it was not the grandmother's interest. The fact that the capital contribution listed in the operating agreement for TitleZone listed $300 and use of the office copier telephones and personnel of the offices of Charles White. And the agreement itself was pre-printed in the name of Charles White, and the name Charles was crossed out and the name Elnora written in. TitleZone's 2005 tax return gives 800 south wells, which is, as Elnora's addressed, which happens to be the office for Eyes Have Not Seen. But we're talking about what Mr. White had. In the briefs he kept saying that White had an interest in it. The only interest that I've seen in the briefs is that he was the executor of the estate. Well, they have, they testified that that was not true, at least at that time, that he was not the executor of the estate in the past. But I'm saying that the department looked at a number of these factors and said, you know, the law does not require that he have a legal interest. The law also requires, it's enough if he has a beneficial interest. And Illinois law further states that if the person has reason to believe, and TitleZone and All-American had at the very least reason to believe that Charles White had the effective interest in this 30%. Because he was the one who had the mortgage company and also the person. No, no, no. No, that's what I'm looking for. He was the executor of the estate. Is there anything in the record you can point to to tell us that he actually had an ownership interest where he was a principal? Well, because all the evidence that addresses Elnora White's interest in TitleZone points straight to Charles White. And the personnel list, there were two other individual minority shareholders. Those people also had tie-in businesses. Those people were listed with the same title as closer, title, clean-up, marketing, and they're also listed as managers in their respective agencies and corporation papers. Did Mr. White have shares in TitleZone or All-American? Did he have equity in it? Our argument is that he had at least a 30% financial interest in TitleZone. His grandmother's. But TitleZone and All-American had at least reason to believe that the effective interest, maybe not the legal interest, but the effective interest, the beneficial interest, he had the benefits and the responsibilities of this interest. It was in Elnora White's name only. And the law says that's enough. You've got to make the disclosure in that case. He was a manager of these entities. He wasn't a shareholder. Well, it is our position that even if he wasn't the legal shareholder, he was still the effective person in interest. And therefore, they had to make a disclosure. Excuse me for interrupting. What is the standard of review here? Am I correct that it's whether or not the Secretary's determination was against the manifest weight of the evidence? For all of the findings of facts that the Secretary made, the standard is manifest weight of the evidence. For the question whether the untrustworthiness and incompetency was demonstrated, the standard of review would be clearly erroneous. But in either case, deference is owed to the agency's determination on this issue. Any further questions? Thank you very much. Would you conclude? With respect to the remaining issues, we will stand on our brief. For all the reasons brought forward in this argument and in our brief, we urge this Court to affirm the circuit court's judgment, sustain the Secretary's decision to revoke the registrations of all American entitled zone. Thank you. Five minutes, Mr. Jepson. Thank you, Your Honor. It's very difficult to retry this in 15 minutes. The fact is that there was already 22. Even in 22, Judge, there was five or six statements.  Thank you, Your Honor. Proceed. There was a five- or six-day trial in front of the hearing officer at the department. And when the trial was over, all the things that are being recast now were decided by the hearing officer to have no merit. The findings and conclusion of law of the hearing officer were only twofold. For all American, that final HUDs were not given to all the parties in a timely basis at the time of the closing, which is contrary to all of the evidence in the file. And even the hearing officer recommended that all Americans' revocation be terminated. In the case of title zone, the only thing that title zone did wrong, according to the hearing officer, is make White a marketing representative of title zone and give a 30% interest to his grandmother. And, again, from our point of view, whether it was his grandmother or White, the problem would still not be a problem with his having a 30% interest because it's not a controlling interest. It's a passive minority interest, and it gave him no position in the title company. But it would give him an additional economic incentive to do what he was doing. Yeah, but, you know, his grandmother had that. So. I don't have to hear it. No, no, I don't have to sit here and not laugh at that. That's not it. Proceed, Mr. Jepson. So the only other thing I would point out to Your Honor is that for what it's worth, under the statute 735 ILCS 53110, the reviewing court is to take into consideration only the record. So evidence or anything stated regarding the, in the briefs or anywhere else, regarding the conviction of White or Felicia Ford should not be considered under the statute. It is well settled, sir, that we're, this court is allowed to consider, take judicial notice of the files of all other courts. We can get certified copies of conviction of Mr. White, Ms. Ford, anybody else we want. We do it all the time. Okay. And that is to the standard. Under All-American, we believe it's manifest weight of the evidence. Under Title Zone, we believe it's de novo because the various cases that were cited in the brief where one cannot be held responsible for the acts of another and without knowledge of the other, would indicate that the Title Zone determination by the hearing officer was not within the law. Thank you, sir. Thank you, Your Honor. The court is taking this matter under advisement. We are adjourned.